UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:11-cr-42 |
| | ) | |
| v. | ) | |
| | ) | *Collier / Lee* |
| | ) | |
| AUGUST ANTHONY FORD | ) | |

## REPORT AND RECOMMENDATION

Before the Court are two motions to suppress filed by Defendant August Anthony Ford

("Defendant") [Docs. 41 & 59].[1] Defendant's first motion seeks to suppress evidence, including his

confession to being a felon in possession of a firearm, resulting from a traffic stop in 2009.

Defendant's second motion, the focus of most of his argument, arises from law enforcement's

warrantless attachment of a Global Positioning System ("GPS") tracking device to Defendant's

vehicle in 2011. After considering the evidence and arguments, I **RECOMMEND** that Defendant's

motions to suppress be **DENIED**.

## I.     FACTS

At the hearing, the Government offered the testimony of Carl Maskew ("Maskew"), a

detective with the Bradley County Sheriff's Department who was assigned as a Task Force Officer

to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") at the relevant time period;

---

[1] Both motions were referred for a report and recommendation pursuant to 28 U.S.C. §
636(b)(1)(B) and (C) [Docs. 46 & 61]. The Government filed responses in opposition [Docs. 64 &
65]. An evidentiary hearing was held on both motions on July 27, 2012. At the request of
Defendant, post-hearing briefs were allowed and, pursuant to the parties' agreed-upon schedule,
Defendant's post-hearing brief was filed August 17, 2012 [Doc. 67], the Government responded on
August 21, 2012 [Doc. 68], and Defendant replied on August 29, 2012 [Doc. 69].

Dale Taylor ("Taylor"), a detective with the Chattanooga Police Department assigned to robbery; and Phillip Narramore ("Narramore"), another detective with the Chattanooga Police Department. Defendant offered no testimony. Considering the officers' testimony and the exhibits in combination, the relevant, and largely undisputed, facts are as follows.

The night of April 14, 2009, Officer Mike Patterson ("Patterson") with the 10th Judicial Drug Task Force stopped Defendant for following too closely on Interstate 75.[2] In the rental vehicle driven by Defendant were three black men: Defendant, Roderick Jennings ("Jennings"), and another passenger. Patterson told Defendant he had been stopped for following another vehicle too closely in violation of the law, asked Defendant about his travel and passengers, and also asked whether Defendant had been in any trouble in the past. Defendant admitted he had been in prison in the past. After asking Defendant about whether he had any drugs, large amounts of currency, or guns in the car, Patterson requested consent to search Defendant's rental car. Defendant responded, "Go ahead." When asked to clarify if he was giving consent for the search, Defendant said, "Yes." Defendant added that he was agreeing to the search because he had not done "anything wrong."

Upon searching under the hood, an officer found a loaded Firestar .45 semi-automatic firearm wrapped in a tee shirt hidden within the engine compartment. All three of the car occupants were then handcuffed and each occupant was separately read a full and complete Miranda warning.

---

[2] This encounter was recorded and the recording was entered into evidence as Government's Exhibit 1, which is composed of two video disks. The audio portion of the recording is shut off at times during the encounter; however, Defendant's consent to search the vehicle and the provision of Miranda warnings to him are recorded on Government's Exhibit 1. Although the pleadings filed by both parties indicate Defendant was also stopped for going two miles per hour over the 70 miles per hour speed limit, the recorded evidence does not indicate speeding as a basis for the stop. During the hearing, Defendant's counsel admitted Defendant committed a traffic infraction, but argued the infraction was not the true motive for the stop.

2

Defendant stated that he understood his rights. All three of the car occupants were convicted felons, and all three denied knowledge of the gun. After the gun was located, Maskew was called to the scene.

Maskew arrived at the scene of the stop and asked Defendant whether he had been advised of and understood his rights, and Defendant indicated he had been advised of his rights. Upon questioning by Maskew, Defendant again denied knowledge of the gun.[3] All three men were arrested that night. The parties agree that Defendant made no incriminating statements the night of his arrest.

The following day, April 15, 2009, Defendant initiated contact with Maskew. Narramore and Maskew then engaged in a recorded interview of Defendant at the jail.[3] After Defendant indicated he wanted to help himself by providing "real valuable information" to law enforcement, Maskew asked Defendant if he understood his rights and Maskew reminded him that he had been advised of his rights the prior night. Specifically, Maskew stated, "Do you remember what your rights are? The ones that were read to you last night. You don't have to if you don't want to. Okay, and you got a right not to say anything if you don't want to say anything. You've got a right to talk to a lawyer before you talk to us for anything if you want to. That's all up to you. I just want to make sure you understand that. Okay, are you clear on that?" In response, Defendant nodded his head, said he could work with law enforcement, and admitted that he had bought the gun located

---

[3] Maskew's on-scene interview was video recorded on the second disk of Government's Exhibit 1.

[3] This jail interview was also video recorded and entered into evidence as Government's Exhibit 2. Defendant was not asked to, and did not, sign a Miranda rights waiver form during the traffic stop or during the jail interview the following day.

3

during the traffic stop. Defendant was later provided a cell phone by the ATF for use during his cooperation.

Segue to more than a year later, in November 2010, when Taylor was working as the lead investigator in a string of robberies. In December 2010, Taylor noticed a similar modus operandi in the robberies. Specifically, a gunman, who sometimes had an accomplice but was usually alone, would enter a location where a single female employee was on duty, have the victim lay on the floor, and would usually grope the female victim's chest or search the victim during the robbery. On January 15, 2011, stamps and other items from the East Lake Post Office were stolen during a robbery with the same modus operandi of the other robberies. Later, police received information from a confidential informant that Defendant was attempting to sell stolen stamps. The police had the confidential informant attempt to obtain incriminating information from Defendant in a recorded phone call, but Defendant did not incriminate himself in the robbery and claimed to have gotten the stamps from someone else. Nonetheless, Defendant became a subject of the investigation at that time.

On March 26, 2011, a robbery with the same modus operandi occurred at the Red Roof Inn. During the robbery, a cell phone was stolen from the groped, female victim. Taylor compared phone records obtained for the victim's stolen phone with records from the ATF phone used by Defendant and found consistent, common calls to three people: Defendant's wife, his girlfriend and his mother's place of employment. Taylor's investigation of Defendant's criminal history revealed he had previously been charged with nine counts of aggravated robbery, pleaded to four counts, and was sentenced to 12 years in prison for robberies committed in 1995 and 1996. Based on the victims' physical descriptions of the robber, Defendant's driver's license photo and other photos of

Defendant, and a police artist's composite sketch from the post office robbery (Defendant's Exhibit 1), Taylor also concluded Defendant, as well as a few other suspects, fit the physical description of the robber.[4] Taylor also knew that Defendant had cut off his long, dreadlocks-style hair after the composite sketch was released. Defendant then became the prime suspect in Taylor's investigation.

Taylor's testimony was inconsistent on whether he believed he had probable cause for an arrest warrant for Defendant or a search warrant at this point in his investigation. Specifically, during cross examination, Taylor testified that he did not believe the phone records from the Red Roof Inn robbery (eventually obtained from AT&T in mid-April) were sufficient to provide probable cause for a search warrant. Upon redirect, Taylor seemed to adopt the Government's position that probable cause did exist at that time if Taylor had thought a warrant was necessary for application and use of a GPS tracking device. It is clear Taylor did not believe a warrant was necessary and did not apply for or obtain one before using GPS technology in this matter. Instead, Taylor obtained approval for his usage of the GPS tracking device through his chain-of-command, a sergeant and lieutenant above him.

On April 22, 2011, Taylor followed the green 1994 Plymouth driven by Defendant for between eight to ten hours. Taylor's plan was to surreptitiously place a GPS tracking device on Defendant's vehicle while the vehicle was parked on a public street. In accordance with his plan, Taylor placed the GPS tracking device on Defendant's car around 1:00 a.m. when the vehicle was parked with "all four tires on a city street" in front of a house in a residential neighborhood.

Taylor did not obtain a warrant prior to the installation or monitoring of the GPS tracking device, and neither Taylor, nor his chain-of-command, sought legal advice about the warrantless use

---

[4] None of the surveillance videos of the robberies clearly identified the robber.

5

of GPS technology in this matter. Taylor had never before, and has never since, installed a GPS tracking device on a suspect's vehicle. Based on his training, experience, and knowledge of the law, Taylor believed the installation and use of the GPS tracking device did not require a warrant because it was merely replacing the manpower and expense of surveillance of Defendant on public streets.[5] Given the nature and number of robberies at issue, if Taylor had not used the GPS tracking device, he would have employed 24-hours-a-day surveillance.

The GPS tracking device could be used to monitor and record the whereabouts of the vehicle in "real-time," but using this "live feed" would update Taylor every three seconds, which would rapidly drain the battery operating the device and would necessitate a physical change of the battery. So instead of tracking the vehicle in real time, Taylor employed a monitoring option that allowed him to receive a daily summary of the recorded information concerning the whereabouts of the vehicle over the prior 24 hours. As a result, every morning during the single week the GPS tracking device was used, Taylor would receive an email with information about where the car had "stopped" the previous day.[6] The reports showed a pinpoint location of every place the car stopped for more than 60 seconds. Taylor could review the GPS data on his computer and zoom in to the street level to see "exactly" where the pinpoints were located without having to look up the latitude and

---

[5] Taylor testified that he understood he could not track Defendant's vehicle onto private property without a warrant, but no evidence was elicited by either side about whether the vehicle ever entered private property during the week the tracking device was deployed or what did happen (or would have happened) if it did so.

[6] Government's Exhibit 7 is a printout of the GPS tracking information emailed daily to Taylor. Little explanation about Government's Exhibit 7 was elicited by the parties, but it appears to be a series of "Google earth" maps with pinpoint flags showing where, and perhaps the order of, Defendant's vehicle "stops" with printouts containing longitude and latitude designations for the stops.

6

longitude coordinates. Taylor hoped the information would reveal a location that was being "cased" for a robbery.

There were no robberies with the noted modus operandi for a week. Then, around noon on April 29, 2011, a Cash Express store was robbed with the same modus operandi. The groped victim, who was also forced to remove her shirt, said the robber had taken money, her cell phone, and some distinctive items of personal jewelry. After responding to the scene of the robbery, Taylor returned to his office to pull the feed from the GPS tracking device. Using the historical GPS information, Taylor determined Defendant's vehicle was located only 200 feet from the Cash Express store during the robbery. By employing the live feed feature of the GPS tracking device, Taylor directed patrol officers to the current location of Defendant's vehicle, which was near a post office, in order to detain Defendant.

Officers encountered Defendant at the post office about two hours after the Cash Express robbery. Defendant was arrested after he admitted to having a bag of marijuana in his car. Once Taylor arrived at the scene of Defendant's arrest, Defendant was searched and the Cash Express victim's jewelry was found on Defendant's person. Defendant was asked if he wanted his car moved to the police station or towed, and Defendant gave Taylor permission to drive his car to the station. After Defendant consented to a search of his car (Government's Exhibit 4) at the police station, law enforcement recovered bank deposit receipts showing more money being deposited by Defendant than both he and his wife earned.

At the station, Defendant was advised of his Miranda rights and he signed a rights waiver form (Government's Exhibit 3). During questioning, Defendant did not admit to committing the robbery; he claimed to have received the money and jewelry in exchange for giving someone a ride

from the area that day. Defendant may have stated that after he left the area of the robbery, he stopped by his mother's house, where he had been living. Taylor may have also gathered this information from the printouts of GPS tracking information he reviewed. Taylor knew from the printouts that Defendant's vehicle had stopped at Jennings' residence on multiple occasions during the monitored week. In response to Taylor's questions, Defendant indicated he had been helping Jennings move during the prior weeks.

At least three police officers went to the home of Defendant's mother, Ms. Connie Gates, to attempt a consensual search around 11:05 p.m. The officers awoke Ms. Gates, who consented to a search of her house.[7] It is possible guns were drawn by the officers who "cleared" the house prior to the search. During the search, officer found clothing similar to that worn in some of the robberies, a ski mask, gloves, a cell phone, and two semiautomatic handguns, one of which matched the unique firearm used in the Cash Express robbery.[8]

In the meantime, and while the search of Ms. Gates' house was taking place, other officers went to Jennings' residence to attempt a consensual search and to locate Jennings. Taylor testified he suspected Jennings was involved in some of the robberies for several reasons: the prior background check of Defendant revealed Jennings had been his co-defendant on the state robbery charges, Jennings was with Defendant during the 2009 traffic stop, and while the majority of robberies had involved a single robber, a few had involved two men.

Jennings was not at his house when the police arrived and his wife initially gave the police

---

[7] Government's Exhibit 5 is the consent form signed by Defendant's mother.

[8] Government's Exhibit 6 is a disk containing photographs related to the search of the house and items seized.

consent to search the residence. Before the search began, however, she revoked her consent. The police then obtained a state search warrant before conducting the search. During the search of Jennings' residence, the police recovered ammunition, an empty firearm box, and clothes that had potential relevance to past robberies.[9] Sometime after the search, Jennings was interviewed for the first time regarding this matter. Eventually, Jennings cooperated with law enforcement and linked Defendant to more than 25 robberies, including the East Lake Post Office robbery.

The original four-count Indictment charges Defendant with various violations of 18 U.S.C. §§ 922 (felon in possession), 1951 (Hobbs Act), and 924 (brandishing a firearm in relation to a crime of violence) [Doc. 1]. The seventeen-count Superseding Indictment charges Defendant with additional counts of various crimes under 18 U.S.C. §§ 922, 1951, 924, and adds charges under 18 U.S.C. § 2114 (assaulting a person having lawful charge of any mail matter or of any money or other property of the United States) [Doc. 33].

## II.    ANALYSIS

The cornerstone of Defendant's various arguments for suppression is the Fourth Amendment to the United States Constitution, which provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. By its own terms, the Fourth Amendment proscribes only unreasonable

---

[9] Jennings was indicted on federal charges of being a felon in possession of a firearm and ammunition based on the results of the residential search, has pleaded guilty to one count of being a felon in possession pursuant to a plea agreement, and is currently awaiting sentencing. *United States v. Jennings*, Civil Action No. 1:11-cr-54 (E.D. Tenn.).

searches and seizures. *Scott v. United States*, 436 U.S. 128, 137 (1978); *United States v. Bishop*, 338 F.3d 623, 625 (6th Cir. 2003).[10]

The events giving rise to Defendant's suppression arguments will be addressed in the order they occurred.

### A. Initial Traffic Stop and Search of the Vehicle in 2009

The first event at issue involves the traffic stop of Defendant in 2009 and the resulting vehicle search and location of a gun. Stopping a vehicle and detaining its occupant is a seizure–a non-consensual, investigative detention–under the Fourth Amendment. *United States v. Gross*, 550 F.3d 578, 582 (6th Cir. 2008). If either the initial traffic stop or the scope and duration of the stop is unlawful, then the evidence obtained from that illegality must be excluded as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). It appears that Defendant is raising the initial stop and the consensual search, and not the scope or duration of the stop, as potential grounds for suppression.

The only evidence at issue from the initial traffic stop and vehicle search is the gun itself, because Defendant made no incriminating statements during the stop as he instead denied any knowledge of the gun at that time. Defendant acknowledged at the hearing that the evidence regarding the traffic stop and vehicle search was undisputed. Also during the hearing, Defendant did not dispute that he was following too closely or driving two miles over the speed limit. Yet,

---

[10] A defendant has the burden of establishing a legitimate expectation of privacy to assert a Fourth Amendment right. *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001). As a preliminary matter, the Government conceded at the evidentiary hearing that Defendant has "standing," meaning Defendant has a legitimate expectation of privacy, with respect to the arguments addressed herein.

Defendant claims the stop and search violated the Fourth Amendment and that, because all the occupants of the vehicle were black, equal protection questions under the Fourteenth Amendment may also arise [Doc. 41 at PageID#: 130].

### 1. The Stop

A traffic stop is a seizure of both the driver and any passengers in the vehicle, *see Brendlin v. California*, 551 U.S. 249, 256-57 (2007); *United States v. Jones*, 562 F.3d 768, 774 (6th Cir. 2009), and any evidence seized during an unlawful traffic stop must be suppressed, *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). The United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *Blair*, 524 F.3d at 748.[11] Because the officers searched for and seized the gun without a warrant, the burden of proof rests on the Government to show that the seizure was lawful. *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) ("The government has the burden of proving the legality of a warrantless search.").

"Probable cause is satisfied when the facts and circumstances within the officer's knowledge, based on reasonably trustworthy information, are sufficient to warrant a man of reasonable caution

---

[11] Recognition of this bifurcated analysis was qualified by a footnote stating, "[W]hether the police may stop a vehicle based on mere reasonable suspicion of a civil traffic violation is the subject of a conflict in our case law . . . . Because we dispose of this case on other grounds, . . . we will not resolve the discrepancy between the probable cause and reasonable suspicion standards at this time." *Blair*, 524 F.3d at 748 n. 2. About one month later, in *United States v. Simpson*, 520 F.3d 531 (6th Cir. 2008), the court held that if the police suspected a violation of the law was ongoing, rather than completed, regardless of whether the violation was criminal or civil in nature, then the stop's constitutionality "is governed by the standard of reasonable suspicion, not probable cause." *Id.* at 541. Here, the Government has argued the police had probable cause to stop Defendant for following too closely and, as a result, that is the standard applied herein.

to believe that an offense has been or is being committed." *United States v. Bonilla*, 357 F. App'x 693, 695 (6th Cir. 2009). Probable cause deals with *probabilities*; it does not require evidence sufficient to establish a prima facie case that a particular law has been violated. *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006). The relevant inquiry is whether the facts known to the officer supported a reasonable belief that Defendant, as the driver of the car, was doing something that represented a violation of the law. *See United States v. Hughes*, 606 F.3d 311, 316 (6th Cir. 2010).

The undisputed evidence is that Patterson stopped Defendant for following too closely, which is a legitimate violation of the law that provides probable cause for a traffic stop.[12] *See, e.g., United States v. Sanford*, 476 F.3d 391, 395-96 (6th Cir. 2007) (holding that a driver violated Tenn. Code. Ann. § 55-8-124 by following another vehicle within ten feet while traveling 65 miles per hour). Although not exactly stated in these words, Defendant claims that, as a black man, he is subjected to a "catch-22" situation where he can be stopped any time by the police for either driving a few miles over, or a few miles under, the speed limit. Defendant seemingly contends that black men, like himself, face a "heads the police win, tails a defendant loses" situation regarding minor traffic infractions. Defendant does not, however, actually dispute that he was speeding a very few miles over the legal limit or was following another vehicle too closely under Tennessee law;[13]

_____

[12] Tenn. Code. Ann. § 55-8-124(a) provides, "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway."

[13] Defendant's briefs seem to question why the recording of the stop does not show the traffic infractions, but it is the Court's understanding that typically the recording equipment is activated after the infraction occurs. In any event, at the hearing Defendant indicated he did not dispute the occurrence of the minor traffic infractions and instead contended he was the victim of selective enforcement based on race.

12

instead, he contends neither of these minor traffic infractions is the real reason for the stop. While Defendant suggests the officer's subjective intent or true purpose for the stop was unrelated to the traffic infractions, such subjective intent or purpose is irrelevant under applicable precedent. *See United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) ("[A]n officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle.") (citing *Whren v. United States*, 517 U.S. 806, 812-13 (1996)); *Hughes*, 606 F.3d 311, 315-16 (rejecting the district court's analysis of why the officer "*really*" stopped the vehicle); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (holding that "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful").

Defendant's argument for suppression based on an allegedly race-based, ulterior motive for the stop is not supported by any evidence or by citation to any authority in his briefs. In any event, the law is settled that an officer's subjective motivation is simply of no legal consequence when there is probable cause for the stop. Officers will often have unrelated suspicions about a traffic violator, but reviewing courts do not ask whether an officer would have made a traffic stop if not for those unrelated suspicions; they ask only whether "this particular officer in fact had probable cause to believe that a traffic offense had occurred." *Ferguson*, 8 F.3d at 391. If so, the stop is reasonable. *Id.* Other than making a passing argument that the real motivation for the stop was impermissible racial-profiling because the vehicle occupants were three black men, Defendant has done nothing to support his argument. Significantly, Defendant has not challenged that he was following another vehicle too closely in violation of Tenn. Code. Ann. § 55-8-124. Thus, Defendant's arguments about alleged profiling and traveling either a few miles over or under the

speed limit are irrelevant. I **FIND** the stop was supported by probable cause and was reasonable because Defendant committed the traffic infraction of following too closely.

Accordingly, I **CONCLUDE** the initial stop of Defendant was lawful.

### 2. The Car Search

"It is the Government's burden by a preponderance of the evidence, to show through clear and positive testimony that valid consent was obtained." *United States v. Hinojosa*, 606 F.3d 875, 881 (6th Cir. 2010) (internal quotations and citation omitted). Police may properly request consent to search during or after a valid traffic stop. *United States v. Canipe*, 569 F.3d 597, 601 (6th Cir. 2009) (consent given after traffic stop concluded); *United States v. Hurst*, 228 F.3d 751, 757-58 (6th Cir. 2000) (consent given during traffic stop). "[A] search conducted pursuant to a valid consent is constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Further, "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. A defendant does not need to know he has the right to refuse consent in order to give an effective consent. *Bustamonte*, 412 U.S. at 227. The critical question is whether the person giving consent felt coerced or gave consent voluntarily. *United States v. Guimond*, 116 F.3d 166, 170-71 (6th Cir. 1997).

In determining whether consent was voluntary, courts consider several factors, such as the characteristics of the accused, including his age, intelligence, and education; whether he understood the right to withhold consent; and whether he understood his constitutional rights. *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998). Courts also should consider the details of the detention, including its length and nature, and the use of coercive or punishing conduct by the police, as well

as more subtle forms of coercion that might effect one's judgment. *Id.* at 402; *see also United States v. Crowder*, 62 F.3d 782, 787 (6th Cir. 1995) (considering factors).

It is difficult to discern Defendant's basis for arguing the consensual search of his vehicle violates the Fourth Amendment. First, Defendant seems to concede he did consent and he has not clearly articulated any claim that his consent was somehow involuntary. Moreover, the evidence presented during the hearing does not support any such claim. The evidence instead demonstrates that Defendant was properly detained as the driver of a vehicle involved in a valid traffic stop. *See Jones*, 562 F.3d at 774 (traffic stop is a seizure of the driver and any passengers). There is no evidence to suggest Defendant's consent was involuntary or the stop was extended beyond the proper scope of a stop prior to the time Defendant was asked for and gave consent to the search. To the contrary, all of the evidence indicates Defendant's consent was entirely voluntary.

Considering the brief length and nature of Defendant's traffic stop at the time he gave consent, there is simply no evidence Defendant's consent was the result of any sort of coercion such as police threats, aggressive language, removal to a non-public venue, or prolonged detention. This conclusion is bolstered by evidence of Defendant's extensive experience with the justice system. Likewise, no evidence indicates Defendant gave consent as any sort of "expression of futility" or in acquiescence to authority. *See United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999). Based on the totality of the circumstances, I **FIND** the Government has met its burden to show by a preponderance of the evidence that Defendant's consent to a search of his rental vehicle was entirely voluntary.

Accordingly, I **CONCLUDE** the search of Defendant's vehicle was lawful.

**B.** **Statements Given During Custodial Interview in 2009**

The next event at issue is Defendant's confession the day following the traffic stop.

Defendant seeks suppression of the incriminating statements he made concerning his possession of

the gun after he initiated contact with officers the day after the initial traffic stop, April 15, 2009.

The controlling law is well settled: a defendant may relinquish his Miranda rights (1) if the waiver

is voluntary—i.e., "the product of a free and deliberate choice rather than intimidation, coercion, or

deception," and (2) if it was knowing and intelligent—i.e., "made with a full awareness both of the

nature of the right being abandoned and the consequences of the decision to abandon it." *Colorado*

*v. Spring*, 479 U.S. 564, 573 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

**1.** **Voluntary**

In assessing whether a confession was made voluntarily, a court must determine, after

assessing the totality of the circumstances, whether the confession was the product of the

defendant's unconstrained free will. *Bustamonte*, 412 U.S. at 225-26. The government bears the

burden to prove that the confession was voluntary by a preponderance of the evidence. *United*

*States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999); *United States v. Wrice*, 954 F.2d 406, 410 (6th

Cir. 1992). While the government bears the burden of proof to show that a waiver of Miranda rights

was voluntary, the defendant must first point to some evidence of improper police activity. *See*

*United States v. Gatewood*, 230 F.3d 186, 193 (6th Cir. 2000) (admitting confession where

defendant "failed to advance any evidence of coercive police activity"). Defendant has shown no

such evidence here, and I **CONCLUDE** his statements were voluntary.

## 2. Knowing and Intelligent

To determine whether a defendant understood and waived his Miranda rights, courts examine the totality of the circumstances, including the suspect's age, experience, education, background, and intelligence. *See United States v. Montgomery*, 621 F.3d 568, 573 (6th Cir. 2010). During the hearing, it was agreed that nothing about Defendant's age, education, background or intelligence would indicate a lack of understanding. Instead, in his post-hearing brief, Defendant appears to argue the "slight" nod of his head in response to Maskew's inquiry about understanding and waiving his Miranda rights was insufficient to indicate he understood his rights and made a knowing and intentional waiver [Doc. 67 at PageID#: 239].

In *North Carolina v. Butler*, 441 U.S. 369, 373-76 (1979), the United States Supreme Court held waiver can be clearly inferred from the actions and words of the defendant in some cases, stating:

> An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. As was unequivocally said in *Miranda*, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights . . . . but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

441 U.S. at 373.

Even refusal to sign a written waiver of rights, standing alone, does not result in the inadmissibility of statements or evidence made voluntarily after full *Miranda* warnings. *United*

*States v. Eicher*, No. 90-1717, 1991 WL 29199, at *2 (6th Cir. 1991) (citing *United States v. Vaughn*, 496 F.2d 622, 622 (6th Cir. 1974)). "[A] waiver may be implied when a suspect answers questions or provides information after being fully informed of his *Miranda* rights." *Id.* (citing *United States v. Boon San Chong*, 829 F.2d 1572, 1574 (11th Cir. 1987)). *See also United States v. Plummer*, No. 2:05-cr-336, 2006 WL 2226010, at *4 (W.D. Pa. Aug. 2, 2006) ("[d]efendant's refusal to sign a written acknowledgment of waiver does not invalidate his implied waiver of *Miranda* rights."); *United States v. Velasquez*, 626 F.2d 314, 320 (3d Cir. 1980) (defendant's willingness to respond to questions after acknowledging that she understood her *Miranda* right is sufficient to constitute an implied waiver of her Fifth Amendment rights under *Butler*).

At the scene of the initial traffic stop, Defendant verbally acknowledged that he understood and waived his rights. The next day he initiated contact with Maskew, who reminded him of his rights. After nodding in response to Maskew's reminder, Defendant proceeded to engage in a non-confrontational interview and subsequently provided long-term assistance to ATF. As argued by the Government, there is no bright line rule about when officers must readvise a defendant of his Miranda rights. *United States v. Weekley*, 130 F.3d 747, 751 (6th Cir. 1997). Furthermore, there are no certain words that law enforcement must use to advise a defendant of his Miranda rights. *Florida v. Powell*, 130 S. Ct. 1195, 1204 (2010). Here, it can be clearly inferred that Defendant knowingly and intelligently waived his Miranda rights by his actions and words.

I **FIND** the Government has met its burden of proving by a preponderance of the evidence, Defendant's Miranda waiver and the voluntariness of his confession. Accordingly, I **CONCLUDE** Defendant's incriminating statements made on April 15, 2009 should not be suppressed.

### C. Warrantless Use of a GPS Tracking Device in 2011

The next event in this saga involves the use of GPS technology in 2011. Defendant's second

motion to suppress addresses his principal argument–an argument much more difficult to resolve–that all evidence resulting from the secret, warrantless installation and monitoring of the GPS tracking device on Defendant's vehicle must be suppressed under the reasoning of *United States v. Jones*, 132 S. Ct. 945 (2012). In explicate reliance on the trespassory nature of the police action, the Supreme Court in *Jones* held secret placement of a GPS tracking device on a vehicle is a search within the meaning of the Fourth Amendment. *Jones*, 132 S. Ct. at 949 ("the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'").

Conceding Taylor did not obtain a warrant authorizing the installation and monitoring of the GPS tracking device on Defendant's vehicle, the Government presents three alternative arguments in opposition to the second motion to suppress. First, the Government contends the warrantless use of the GPS tracking device was reasonable and thus not a violation of the Fourth Amendment. Second, the Government contends that even if the use of the GPS tracking device was unreasonable, the exclusionary rule should not apply under the reasoning of *Davis v. United States*, 131 S. Ct. 2419 (2011) and *Herring\ v. United States*, 555 U.S. 135 (2009). Finally, the Government argues Defendant inappropriately relies on *United States v. Lee*, ___ F. Supp. 2d ___, 2012 WL 1880621, (E.D. Ky. May 22, 2012), in asserting there are no intervening factors to disfavor suppression and it argues the decision in *United States v. Baez*, ___F. Supp. 2d ___ , 2012 WL 2914318 (D. Mass. July 16, 2012), more appropriately resolves the issue in favor of refusing to suppress the evidence gained from the application and monitoring of a warrantless tracking device.

Two observations bear mention. First, neither party solicited much evidence regarding the actual GPS tracking device used in the case. It is clear, however, that the device placed on Defendant's car had its own battery and did not rely on Defendant's car for power. It appears the

device was some sort of "slap on" unit that was installed by placing it on the undercarriage of Defendant's vehicle.  The device apparently communicated location coordinates wirelessly to a remote computer server whenever Defendant's vehicle stopped for 60 seconds.  Taylor could either monitor the location of the device in real-time or at adjustable time periods.  Taylor chose to conserve battery power by monitoring the device's location coordinates during the prior 24-hour time period for about a week.  After the Cash Express robbery, however, he activated the real-time features of the GPS tracking device to quickly determine Defendant's whereabouts the day of the last robbery and to track Defendant down for questioning.

Second, and just as scant evidence was offered regarding the device used by Taylor, little evidence was presented regarding the fruits of the monitoring.  While Taylor made a point of attaching the device to Defendant's vehicle while it was parked on a public street because he believed he would need a warrant to attach the device to a vehicle parked on private property such as in a garage, no testimony was solicited from Taylor regarding whether the vehicle's movements were ever monitored while it was on private property.  Perhaps the log printouts (Government's Exhibit 7) could be analyzed to determine whether or not the Defendant's vehicle was "tracked" onto private property or outside the range of visual observation via a public location, but no such analysis was provided to the Court.

### 1.    Was the Search Reasonable?

The Government first contends that under the Fourth Amendment, Taylor's warrantless use of a GPS tracking device was a reasonable search. The Government argues such devices are valuable investigatory tools for obtaining probable cause that can lead to an arrest warrant.  This is undoubtedly true; however, GPS tracking is a powerful tool and, as such, should not be used inappropriately.  *Jones* does not address whether the warrantless attachment and monitoring of a

GPS tracking device would pass Fourth Amendment scrutiny if supported by reasonable suspicion or probable cause because the government in *Jones* failed to raise that issue and thus forfeited the inquiry. *Id.* at 954. The issue is squarely raised here.

As argued by the Government, courts must "examine the totality of the circumstances" to determine whether a search or seizure is reasonable under the Fourth Amendment. *Samson v. California*, 547 U.S. 843, 848 (2006). The reasonableness of a search or seizure is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 848 (internal quotations and citation omitted).

### a. Individual's Privacy Interests

The Government argues the intrusion occasioned by attachment of a GPS tracking device to a vehicle is quite minimal, far less than a stop and frisk, because it does not require the removal of anything from the vehicle or entry into any enclosed area of the vehicle. With respect to monitoring, the Government contends neither a warrant nor probable cause should be required because the privacy interest, if any, is minimal and the device reveals only limited data about where a vehicle is located. The same information could be obtained by law enforcement via visual surveillance without a warrant, albeit at a far greater cost in terms of manpower and resources.

Applying *Jones*, I reject the Government's argument that the intrusion occasioned by attachment and use of a GPS tracking device to a vehicle is quite minimal. Under the reasoning of the majority in *Jones*, it is the physical trespass on the property, i.e., the vehicle, that makes the search unlawful. Whether the police would have had sufficient probable cause to obtain a warrant for the use of the GPS tracking device is largely irrelevant under these circumstances, because no

21

warrant was obtained. *See United States v. Ortiz* , ___ F. Supp. 2d ___, 2012 WL 2951391 (E.D. Pa. July 20, 2012) (rejecting similar arguments by government upon application of the balancing test).

As in *Ortiz*, the Government here overemphasizes what GPS monitoring cannot show and underestimates what it can show. True, there are limitations on the data that GPS tracking provides as it only shows where the tracking device is located, not who is driving the car or what the occupants of the car are doing. Such "limitations," however, also weigh against the Government because the GPS technology allowed the police to track the whereabouts of the vehicle 24 hours a day/seven days a week, no matter who was driving the car or where it was driven. It allowed the agents to track the vehicle in real time or at set intervals at the convenience of the monitoring officer. Therefore, GPS monitoring has the significant potential to yield protected information, such as the location of the tracking device at places which would normally be protected from police surveillance. In the instant matter, the GPS technology showed Taylor where Defendant (or at least his vehicle) was during the robbery, where Defendant was located two hours after the robbery, where Defendant stopped between the robbery and his apprehension, and Defendant's association with and visits to Jennings' house over the course of the surveillance. I **FIND** the installation and monitoring of the GPS tracking device to be a significant intrusion.

### b. Government's Legitimate Interests

Turning to the Government's legitimate interests in GPS monitoring, the Government argues, without any corroborating evidence, that the necessity of obtaining a warrant before using a tracking device on a vehicle "would come at great expense to law enforcement investigations" [Doc. 64 at PageID#: 206]. The identical argument was rejected in *Ortiz,* 2012 WL 2951391, at *15. Here,

Taylor had time to go through his chain-of-command to get permission to use a GPS device, but the Government has presented no good reason why Taylor could not have employed Federal Rule of Criminal Procedure 41 to obtain a tracking warrant since the Government essentially argues he had probable cause for such a warrant at the time he applied the device to Defendant's vehicle.

After balancing the intrusion on a suspect's Fourth Amendment rights when the police attach and monitor a GPS tracking device on a suspect's vehicle with the proven legitimate government interests served by taking such action, the scales are tipped against the Government.[14] Under the totality of the circumstances, I **FIND** the warrantless search violated the Fourth Amendment.

### D. The Exclusionary Rule

As is often the case, however, the Defendant's victory in establishing a Fourth Amendment violation is short-lived due to the good faith exception to the exclusionary rule. True, and as argued by Defendant, "[t]he general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible." *United States v. Dice*, 200 F.3d 978, 983 (6th Cir. 2000); *see also Mapp v. Ohio*, 367 U.S. 643, 654 (1961) (holding that "all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court"); *Weeks v. United States*, 232 U.S. 383, 398-99 (1914) (establishing the exclusionary rule as the remedy for violations of the Fourth Amendment). Nevertheless, and as argued by the Government, it is equally true that suppression of evidence "is not an automatic consequence of a Fourth Amendment violation." *Herring*, 555 U.S. at 137; *accord United States v. Buford*, 632 F.3d 264, 270 (6th Cir.

---

[14] The Government made only a passing reference to the automobile exception in its briefs, noting that the automobile exception allows warrantless searches that would not be reasonable in other contexts. To the extent the Government's position on the automobile exception is not abandoned by its failure to develop the argument, I reject it for the reasons stated in *Ortiz,* where the argument was apparently more fully articulated. *Ortiz,* 2012 WL 2951391, at *16-18.

23

2011).

Exclusion of evidence is a "judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" *Herring*, 555 U.S. at 139-40 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). The exclusionary rule applies only where "its remedial objectives are thought most efficaciously served," *Arizona v. Evans*, 514 U.S. 1, 11 (1995), and where it "'results in appreciable deterrence.'" *Herring*, 555 U.S. at 141 (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). "'[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs.'" *Herring*, 555 U.S. at 141 (quoting *Illinois v. Krull*, 480 U.S. 340, 352-53 (1987)). In the end, the decision to suppress evidence "turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." *Herring*, 555 U.S. at 137.

The Government contends the exclusionary rule should not apply here because Taylor applied and monitored the GPS technology under a good faith assumption that no warrant was necessary. The Government also argues against suppression because "[t]he purpose of the exclusionary rule is to deter future Fourth Amendment violations, not to remedy past ones." [Doc. 64 at PageID#: 208] (citing *Davis*, 131 S. Ct. at 2426). In contrast, Defendant, principally in reliance on the analysis of *Davis* found in *Lee*, 2012 WL 1880621, argues there was no *binding* precedent in the Sixth Circuit before *Jones* so the police could not have reasonably relied on any belief that a warrant was unnecessary for the application and monitoring of a GPS tracking device [Doc. 60 at PageID#: 191-92].

Under *Davis*, "when the police conduct a search in objectively reasonable reliance on binding judicial precedent" that is subsequently reversed, there is no police wrongdoing to deter; and

24

thus, no justification for excluding evidence. *Davis*, 131 S. Ct. at 2428-29. Agreeing there was no

*binding* precedent regarding the warrantless use of GPS tracking in the Sixth Circuit when Taylor

opted to use this technology, the parties' arguments in the instant matter are focused on whether

*Davis* applies when there is no *binding* judicial precedent. The Government offers several pre-*Jones*

cases from other circuits to argue the Sixth Circuit *would have* found the warrantless use of such

GPS tracking devices to be lawful. As might be expected, Defendant points to the contrary circuit

court decision finding the warrantless use of a GPS tracking device to be a violation of the Fourth

Amendment.

Creating a circuit split prior to *Jones*, several circuit courts held the warrantless application

of a GPS tracking device passed constitutional muster,[15] while one circuit court held to the

contrary.[16] Now, and as might be expected, courts in jurisdictions without binding appellate

precedent prior to *Jones* have begun to struggle with issues concerning the application of the

exclusionary rule to evidence obtained via the use of GPS tracking prior to *Jones*,[17] with mixed

results. To date, it appears the Sixth Circuit has not addressed a case involving the pre-*Jones*

warrantless application and monitoring of a GPS tracking device in the post-*Jones* context.

A comprehensive review of the status of the law post-*Jones* was not presented by either

---

[15] *See United States v. Hernandez,* 647 F.3d 216 (5th Cir. 2011); *United States v. Marquez,* 605 F.3d 604 (8th Cir. 2010); *United States v. Garcia,* 474 F.3d 994 (7th Cir. 2007); *United States v. McIver,* 186 F.3d 1119 (9th Cir. 1999).

[16] *United States v. Maynard,* 615 F.3d 544 (D.C. Cir. 2010).

[17] Perhaps foreseeing such an issue arising after *Davis*, the concurring opinion noted *Davis* did "not present the markedly different question whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled" or "whether exclusion would appreciably deter Fourth Amendment violations when the governing law is unsettled." *Davis*, 131 S. Ct. at 2435, 2436 (Sotomayor, J., concurring in the judgment).

party.  It appears, however, that trial courts in circuits without pre-*Jones* binding precedent are beginning to issue opinions with a vast array of insights and differing results.  Some district courts have held law enforcement could reasonably rely on non-binding appellate decisions from other circuits to avoid application of the exclusionary rule to evidence resulting from the warrantless use of GPS tracking technology.  *See e.g., Baez*, 2012 WL 2914318, at *1; *United States v. Leon*, No. CR 09–00452 JMS, 2012 WL 1081962, at *4–5 (D. Haw. Mar. 28, 2012).  Other district courts have held to the contrary.  *See e.g., Lee*, 2012 WL 1880621, at *6–10; *Ortiz*, 2012 WL 2951391, at *1; *United States v. Lujan*, No. 2:11CR11–SA, 2012 WL 2861546, at *3 (N.D. Miss. July 11, 2012); *United States v. Katzin*, No. 11–226, 2012 WL 1646894, at *9-10 (E.D. Pa. May 9, 2012).  In *Ortiz*, *Lujan*, *Lee*,[18] and *Katzin*, the district courts have seemingly adopted a bright-line rule under *Davis* that law enforcement cannot rely in good faith on non-binding precedent from other circuits.

In addition, a least one court in the Sixth Circuit has offered commentary on the potential application of *Davis* to the use of GPS technology, while not directly confronting the issue.  *See United States v. Luna–Santillanes*, No. 11–20492, 2012 WL 1019601, at *9 n. 5 (E.D. Mich. Mar. 26, 2012) (declining to reach the question but stating the government's argument was persuasive "because the use of a GPS device on a vehicle without first obtaining a search warrant was a widely-accepted practice in the police community that had not been held unconstitutional by the Sixth Circuit").  And, at least one other court has determined the best approach to the issue is a timeline analysis of "whether law enforcement relied in good faith on judicial precedent," which it found required a case-by-case assessment of the "legal landscape" at the time of the Fourth

---

[18] Notably, law enforcement's use of GPS tracking technology in *Lee*, the case relied upon by Defendant, occurred after the Supreme Court had granted certiorari in *Jones*.  *See United States v. Oladosu*, ___F. Supp. 2d ___, 2012 WL 3642851 at *8 (D.R.I. Aug. 21, 2012).

Amendment violation. *United States v. Oladosu*, ___F. Supp. 2d ___, 2012 WL 3642851 at *9 (D.R.I. Aug. 21, 2012).[19]

On the issue of warrantless use of GPS tracking technology, *Herring*–another fairly recent Supreme Court opinion addressing the good faith exception–has not received as much attention in the post-*Jones* cases as *Davis*. In *Herring*, the Court rejected the application of the exclusionary rule where an "officer reasonably believes there is an outstanding arrest warrant, but that belief turns out to be wrong because of a negligent bookkeeping error by another police employee." *Herring*, 555 U.S. at 137. Analogizing to its decisions in *Leon*, 468 U.S. at 922 (exclusionary rule inapplicable where police act on objectively reasonable reliance on a warrant issued by a neutral magistrate) and *Evans*, 514 U.S. at 14–15 (exclusionary rule inapplicable where police acted in reasonably reliance on a court database which mistakenly indicated that a warrant was outstanding), the Court concluded that any deterrent effect of applying the exclusionary rule in *Herring* was outweighed by the costs to society. *Herring*, 555 U.S. at 140-43, 147-48.

The Sixth Circuit interpreted the impact of *Herring* on Fourth Amendment violations in *United States v. Master*, 614 F.3d 236, 241-43 (6th Cir. 2010), a case arising from this district. In *Master*, a case involving a defective warrant, the Sixth Circuit read *Herring* as "effectively creat[ing] a balancing test by requiring that in order for a court to suppress evidence following the

_____

[19] The court in *Oladosu* described this "*Baez*-inspired timeline" approach as being reflective of a common theme of all of the cases, because it was an assessment of police culpability based on the status of the binding and non-binding precedent at the time of the GPS tracking. 2012 WL 3642851, at *9. A timeline approach in this case would show on August 6, 2010, the D.C. Circuit held for the first time that the warrantless use of GPS for one month was a search. *Maynard*, 615 F.3d 544. Months later, from April 22 to April 27, 2011, Taylor placed the device and tracked Defendant's vehicle's whereabouts. A couple of months later, on June 27, 2011, the Supreme Court granted certiorari in *Jones*. 131 S. Ct. 3064. On January 23, 2012, the *Jones* decision was rendered.

finding of a Fourth Amendment violation, 'the benefits of deterrence must outweigh the costs.'" *Master*, 614 F.3d at 243 (quoting *Herring*, 555 U.S. at 141). The Sixth Circuit reasoned that "the *Herring* Court's emphasis seems weighed more toward preserving evidence for use in obtaining convictions, even if illegally seized, than toward excluding evidence in order to deter police misconduct unless the officers engage in 'deliberate, reckless, or grossly negligent conduct.'" *Id.* (quoting *Herring*, 555 U.S. at 144). *See also United States v. Godfrey,* 427 F. App'x 409, 412 (6th Cir. 2011) (quoting *Master*).

Both *Herring* and *Master* involved officers' reasonable reliance on what appeared to be facially valid warrants that were later determined to be defective. Both *Herring* and *Master* appear to fall within the *Leon* good faith exception to the exclusionary rule because the *Leon* exception has been applied in circumstances where officers reasonably and in good faith: (1) rely on a subsequently declared invalid warrant, *Leon*, 468 U.S. at 922-23; (2) perform a warrantless search based upon a statute later declared unconstitutional, *Krull*, 480 U.S. at 349-53; (3) act upon mistaken information about an outstanding warrant, *Herring*, 555 U.S. at 143-46; *Evans*, 514 U.S. at 14-16; and (4) conduct a search allowed by existing case law which is later overturned, *Buford*, 632 F.3d at 276-77.

The *Leon* exception, however, has not been applied to all warrantless searches. *See e.g., United States v. Morgan*, 743 F.2d 1158, 1165 (6th Cir.1984) (rejecting *Leon* in the context of a planned, warrantless arrest without exigent circumstances where the defendant was forced out of his home to execute the arrest); *United States v. Lazar*, 604 F.3d 230, 237-38 n. 6 (6th Cir. 2010) (rejecting that *Herring* "greatly expanded" the good faith exception and "changed the applicable standard," and finding "*Herring* does not purport to alter that aspect of the exclusionary rule which

applies to warrants that are facially deficient warrants *ab initio*."); *United States v. Stokely*, 733 F. Supp. 2d 868, 906 (E.D. Tenn. 2010) (Varlan, J. accepting and adopting report & recommendation by Shirley, Mag. J.) ("Unlike the officers in *Herring* who relied upon the representation of other law enforcement personnel that an arrest warrant was outstanding or the officers executing the search warrant in *Leon* who relied upon the judge's determination that probable cause to issue a search warrant existed, [the police officer] made the decision to detain [defendant] at the scene based upon her and her fellow officers' assessment that such detention was necessary and legal. Thus, the Fourth Amendment violation in this case resulted from the deliberate action of law enforcement and is of a type that could be deterred by exclusion of the evidence.").

Under *Herring*, as applied in *Master*, evidence should be suppressed "only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Herring*, 555 U.S. at 143 (quoting *Krull*, 480 U.S. at 348-49) (internal quotation marks omitted); *accord Master*, 614 F.3d at 241-43.[20] Thus, a crucial finding needed to suppress evidence is the balance between whether police misconduct is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring,* 555 U.S. at 144. The Supreme Court has often held the exclusionary rule's sole purpose is to deter future Fourth Amendment violations and has limited the rule's operation to situations in which the purpose of

---

[20]  It has been noted that the good faith exception could be in the process of swallowing the exclusionary rule. *Davis*, 131 S. Ct. at 2439 ("if the Court means what it now says, if it would place determinative weight upon the culpability of an individual officer's conduct, and if it would apply the exclusionary rule only where a Fourth Amendment violation was 'deliberate, reckless, or grossly negligent,' then the 'good faith' exception will swallow the exclusionary rule.") (Breyer, J., dissenting).

Case 1:11-cr-00042-CLC-SKL   Document 70   Filed 09/12/12   Page 29 of 31   PageID #: 279

appreciable deterrence is achieved. *See, e.g., Davis*, 131 S. Ct. at 2426–27. Deterrent value alone, however, is insufficient for exclusion because any analysis must also "account for the 'substantial social costs' generated by the rule," since exclusion "exacts a heavy toll on both the judicial system and society at large." *Id.* (quoting *Leon*, 468 U.S. at 907). Application of the exclusionary rule to suppress evidence typically "requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence," so the "bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Id.* at 2427. Thus, it is a remedy of last resort and the benefits of deterrence must outweigh the heavy cost of exclusion. *Id.*

  This Court must determine where Taylor's use of GPS technology lies on the exclusionary-rule-spectrum. I **CONCLUDE** that a bright-line rule rejecting the application of the exclusionary rule under *Davis* simply because there was no *binding* precedent in the Sixth Circuit, as urged by Defendant, does not pay due regard to *Herring* and *Master*. Applying the *Herring* balancing test, as I believe I must under *Master*, and considering the benefits of deterrence against the costs, I **FIND** that even though there was a Fourth Amendment violation in this case, suppression is not an appropriate remedy. At the time Taylor used GPS tracking technology, several circuits had approved the warrantless use of GPS tracking technology; only one had not. The Supreme Court had not yet granted certiorari to address the conflict among the circuits. The Sixth Circuit had not rendered an opinion on the warrantless use of the technology. In addition, Taylor's conduct involved only an isolated, one-time application of GPS tracking technology resulting in a single week of monitoring. I do not find Taylor's conduct was a deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights. I also **CONCLUDE** application of the good faith exception in this matter would not stretch *Davis, Herring* and *Master* beyond the bounds of precedent or the

Fourth Amendment.[21]  Under the collective reasoning of the good-faith precedent discussed above,

I **FIND** a good faith exception to the exclusionary rule applies to the evidence obtained as a result

of the warrantless application and monitoring of GPS technology in this case.[22]

## III.   CONCLUSION

For the reasons stated above, I **RECOMMEND** that both of Defendant's motions to suppress

[Docs. 41 & 59] be **DENIED**.[23]

s/ *Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[21] Unfortunately, Defendant's briefs neither mention *Herring* nor address the Government's arguments's concerning *Herring*.  Instead, Defendant asserts good faith "doesn't matter" [Doc. 69 at PageID#: 248] and limits his good faith analysis to the lack of binding precedent under the holding of *Davis* as addressed in *Lee* [Doc. 60 at PageID#: 191-92]. Inexplicably, neither party discussed *Master* even though it sets forth the Sixth Circuit's interpretation of *Herring*. Thus, this report and recommendation is issued without the benefit of the parties' input on the application of *Master*.

[22] As a result, I do not reach the parties' attenuation arguments.

[23] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure.  Failure to file objections within the time specified waives the right to appeal the district court's order.  *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).